## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

Isamar SANCHEZ CHICAS, on behalf )
of herself and her minor child, J-A-S-, )
Berks County Residential Center, )
1040 Berks Road, Leesport, PA 19533, )
    )
Dominga RIVAS ANGEL, on behalf of )
herself and her minor children, J-E-R- )    Civil Action No.:
and J-A-R-, )
Berks County Residential Center, )
1040 Berks Road, Leesport, PA 19533, )
    )
      *Plaintiffs,* )
    )
v. )
    )
Jeh C. JOHNSON, Secretary of )
Homeland Security, Washington, D.C. )
20528; )
Loretta LYNCH, Attorney General of )
the United States, 950 Pennsylvania )
Ave., NW, Washington, D.C. 20520; )
Sarah SALDAÑA, Director, U.S. )
Immigration & Customs Enforcement, )
500 12th Street, SW Washington, D.C. )
20536-5009; )
Thomas DECKER, Field Office )
Director, Philadelphia ICE Field )
Office, 1600 Callowhill Street, )
Philadelphia, PA 19130; )
Diane EDWARDS, Executive Director, )
Berks County Residential Center, )
1040 Berks Road, Leesport, PA 19533, )

      *Defendants.*

16    2558

---

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

## Introduction

1.     This is an action under the Settlement Agreement in *Flores v. Lynch*, CV-85-4544 (C.D. Cal.), to challenge the continuing immigration detention of a four year old child, a seven year old child, an eight year old child, and their mothers at the Berks County Residential Center in Leesport, Pennsylvania ("BCRC"). The child Plaintiffs have all been detained for four and a half months.

2.     The failure to release Plaintiffs and subjecting them to extended detention in a facility that is secure, unlicensed, improperly licensed, or in violation of its license, is unlawful.

## Subject Matter Jurisdiction

3. This Court has jurisdiction pursuant to ¶ 24(B) of the Flores Settlement Agreement; 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1346 (United States as defendant); Jurisdiction lies to grant declaratory relief pursuant to 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act).

## Venue

4.     Plaintiffs are presently detained at the Berks County Residential Center in Leesport, Pennsylvania.

5.     This District is the proper venue because J-A-S-, J-E-R-, J-A-R- and their mothers "may seek judicial review in any United States District Court with jurisdiction and venue over the matter" to challenge their placement and the conditions of the placement. Flores Settlement Agreement ¶ 24(B).

1

## Parties

6.   Plaintiff Isamar Sanchez Chicas is a 22 year old native and citizen of El Salvador. She brings this action on behalf of herself and her minor child, J-A-S-, who is a seven year old native and citizen of El Salvador. Together, they fled El Salvador seeking protection from persecution they suffered and fear they will continue to suffer if they are forced to return to El Salvador.

7.   Plaintiff Dominga Rivas Angel is a 28 year old native and citizen of El Salvador. She brings this action on behalf of herself and her minor children, J-E-R- and J-A-R-. Plaintiff J-E-R-, Ms. Rivas Angel's four year old child, is a citizen of El Salvador. Plaintiff J-A-R-, Ms. Rivas Angel's eight year old child, is also a citizen of El Salvador. Together, they fled El Salvador seeking protection from persecution they suffered and fear they will continue to suffer if they are forced to return to El Salvador.

8.   Defendant Jeh C. Johnson is the Secretary of Homeland Security and is the head of the U.S. Department of Homeland Security (DHS) and has ultimate responsibility for the administration and enforcement of the immigration laws.  He is sued in his official capacity.

9.   Defendant Loretta Lynch is the Attorney General of the United States and the head of the U.S. Department of Justice (DOJ).  She shares responsibility for the administration and enforcement of the immigration laws.  She is sued in her official capacity.

10. Defendant Sarah Saldaña is the Director of U.S. Immigration Customs &

2

Enforcement (ICE), a component of DHS.  In that capacity, she has direct authority over all ICE policies, procedures and practices relating to the detention and deportation of noncitizens.  She is sued in her official capacity.

11. Defendant Thomas Decker is the Director of the ICE Field Office for Philadelphia.   He exercises authority over ICE activities in the Pennsylvania region. He is sued in his official capacity.

12. Defendant Diane Edwards is the Executive Director of the Berks County Residential Center in Leesport, Pennsylvania, a family detention center operating in Berks County, Pennsylvania. She is charged, and has direct authority, over the physical care and daily detention of the Plaintiffs. She is sued in her official capacity.

### Permissive Joinder

13.  Plaintiffs bring this action jointly pursuant to Federal Rule of Civil Procedure 20(a), which allows for permissive joinder. Plaintiffs assert a "right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences." Fed. R. Civ. P 20(a). This case raises common questions of law and fact.

### Legal Framework

14.  On January 28, 1997, a class-wide settlement agreement was reached in a case that is presently captioned *Flores v. Lynch*, CV-85-4544 (C.D. Cal.) (Flores Agreement). According to the stipulation of the parties in that settlement agreement, the terms of the Flores Agreement are in effect and remain in effect until the 45th day "following defendants' publication of final regulations implementing" the Flores

3

Agreement itself. Regulations have never been published.

15. The Flores Agreement applies to "[a]ll minors who are detained in the legal custody of the INS." *See* Flores Agreement ¶ 10. A "minor" is "any person under the age of eighteen (18) years who is detained in the legal custody of the INS." *See id.* ¶ 4.

16. The Flores Agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS[.]" *See id.* ¶ 9. Immigration authorities must treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." *See id.* ¶ 11.

17. The Flores Agreement provides Defendants with four options respecting the custody of a class member, in a preference order: (1) a Paragraph 14 release from DHS custody; (2) a Paragraph 19 temporary placement in a licensed program; (3) a Paragraph 21 secure placement; or, (4) a brief Paragraph 12 placement in an INS detention center when immediate release or placement is not possible.

18. At all times, Defendants must seek and work to release a minor. "Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay[.]" *See id.* ¶ 14.

19. Under the Flores Agreement, the release of the class member to his or her parent is the primary objective. *See id.* ¶ 14. Release is *always* the most preferred option.

20. In order to effectuate the release of a class member, a parent detained with a

4

class member should also be simultaneously released. *See Flores v. Lynch*, No. 85-CV-04544 (C.D. Cal.), Order Re Response to Order to Show Cause, ECF No. 189 (Aug 21, 2015) at 14. "To comply with Paragraph 14A of the Agreement and as contemplated in Paragraph 15, a class member's accompanying parent shall be released with the class member in accordance with applicable laws and regulations unless the parent is subject to mandatory detention under applicable law or after an individualized custody determination the parent is determined to pose a significant flight risk, or a threat to others or the nationality security, and the flight risk of threat cannot be mitigated by an appropriate bond or conditions of release." *Id.*

21. The second option regarding custody, in preference order, is a temporary placement in a "licensed program until such time as release can be effected in accordance with Paragraph 14 or until the minor's immigration proceedings are concluded, whichever occurs earlier." *See id.* ¶ 19.

22. The Flores Agreement specifies that a "licensed program" must be licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children. *See id.* ¶ 6.

23. A licensed program must "comply with all applicable state child welfare laws and regulations and all state and local building, fire, health and safety codes[.]" *See id.* at Exhibit 1. It must also provide an array of services such as "[a]pproriate routine medical and dental care[,]" individualized needs assessments, educational services, leisure and recreation activities, individual counseling sessions, group counseling sessions, and acculturation and adaptation services among others. *Id.*

5

24. The licensed program must be at a home or facility that is non-secure. *See id.*

25. The third option regarding custody is placement in a "State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility[.]" *See id.* ¶ 21. A Paragraph 21 placement is authorized only where there has been a determination that the minor is charged with or is delinquent because of a violent or serious crime, engaged in credible threats of violence, engaged in disruptive conduct, is an escape-risk, or for his own safety. *See id.* Even so, a Paragraph 21 placement must be in the least restrictive environment. *See id.*

26. The fourth and least preferred option regarding custody is a placement under paragraph 12 which permits placement for no more than 3 days in most instances and 5 days in almost any other event in an INS-detention facility or INS-contracted detention facility. *See id.* ¶ 12. This temporary placement is permitted only when a Paragraph 14 release is not immediately possible or a Paragraph 19 placement is not immediately available. *Id.*

27. The Flores Agreement authorizes class members to challenge the custodial decision regarding the minor in "any United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1." *See id.* ¶ 24B.


// 

//

6

### Facts

### Plaintiffs Ms. Sanchez Chicas and J-A-S-: Fear of Persecution and Pending Immigration Proceedings

28. Before fleeing to the United States, Ms. Sanchez Chicas lived in El Salvador with J-A-S-, whom she raised as a single mother.

29. Ms. Sanchez Chicas supported herself and her daughter by operating a food stand in Gualache, Tecapan, Usulutan, El Salvador.

30. In February 2014, M18 began a targeted campaign of persecution directed at Ms. Sanchez Chicas.

31. M18, also known as the *Barrio 18*, is a powerful and violent organization in El Salvador that is engaged in a conflict with the legitimate Salvadoran state. M18 is often referred to as a transnational criminal organization or a "gang."

32. In or about February, 2014, M18 visited Ms. Sanchez Chicas in person and demanded that she pay "rent" to the gang in order to continue to operate her business and avoid violent reprisal. Ms. Sanchez Chicas told them she would not pay.

33. Shortly thereafter, M18 murdered Ms. Sanchez Chicas's brother-in-law. His wife, Ms. Sanchez Chicas's sister, also operated a food stand in Gualache, El Salvador, and she had refused to pay M18's demanded "rent."

34. M18 continued to demand payment from Ms. Sanchez Chicas by contacting her repeatedly by phone. M18 threatened Ms. Sanchez Chicas that if she did not make payments as directed, she would end up dead like her brother-in-law. M18 also threatened to harm J-A-S-, telling Ms. Sanchez Chicas that they knew where to find

7

her daughter.

35. Ms. Sanchez Chicas reported M18's threats and demands to the El Salvadoran police, but they did not protect her or J-A-S-.

36. In or about February, 2014, M18 members returned to demand payment from Ms. Sanchez Chicas in person. Terrified, Ms. Sanchez Chicas made three payments.

37. In or about March, 2014, Ms. Sanchez Chicas refused to make further "rent" payments to M18. M18 members once again threatened to kill J-A-S- if Ms. Sanchez Chicas did not fulfill their demands.

38. Ms. Sanchez Chicas was acutely aware of the dangers facing those who disobey the gangs in El Salvador not only because of the murder of her brother-in-law, but also because in 2009, members of MS13, the rival gang to M18, cut off her brother's fingers with a machete after he refused their efforts to recruit him into their gang. He was in a coma for months afterwards.

39. Fearing imminent harm—knowing she was in grave danger for having disobeyed the demands of M18 and that the Salvadoran police would not protect her—Ms. Sanchez Chicas fled to the United States with J-A-S-.

40. On or about May 30, 2014, the DHS Defendants took Ms. Sanchez Chicas and J-A-S- into custody near the United States-Mexico border and held them at a border patrol detention facility.

41. On or about June 3, 2014, the DHS defendants released Ms. Sanchez Chicas and J-A-S- with instructions to appear for proceedings before an Immigration Judge, pursuant to 8 U.S.C. § 1229a(a), to determine whether they could lawfully remain in

the United States or would be ordered removed.

42. Ms. Sanchez Chicas and J-A-S- were not detained during their proceedings before an Immigration Judge pursuant to 8 U.S.C. § 1229a(a).

43. Ms. Sanchez Chicas and J-A-S- appeared at every scheduled hearing before the Immigration Judge.

44. Ms. Sanchez Chicas, with the help of her father, retained an attorney who represented her and J-A-S- in removal proceedings before the Immigration Judge.

45. The attorney filed an application for asylum under 8 U.S.C. § 1158 on behalf of Ms. Sanchez Chicas and J-A-S-. However, the attorney did not consult with Ms. Sanchez Chicas in the preparation of that application.

46. At Ms. Sanchez Chicas's final hearing before the Immigration Judge, the attorney withdrew Ms. Sanchez Chicas's application for asylum, without Ms. Sanchez Chicas's knowledge or consent. Instead, the attorney sought relief from removal only in the form of withholding of removal under the Convention Against Torture, which requires the applicant to meet a higher burden of proof, and results in less permanent protection, compared to asylum.

47. The Immigration Judge ordered Ms. Sanchez Chicas and J-A-S- removed from the United States in January 2015, in an oral decision delivered in English. Ms. Sanchez Chicas has a fifth grade education and does not speak English.

48. Ms. Sanchez Chicas's attorney did not explain the Immigration Judge's decision to Ms. Sanchez Chicas, nor its legal consequences.

9

49. Ms. Sanchez Chicas's attorney did not explain her right to appeal the Immigration Judge's decision.

50. On January 2, 2016, the DHS Defendants arrested Ms. Sanchez Chicas and J-A-S- at their home. The DHS Defendants transferred Ms. Sanchez Chicas and J-A-S- to the South Texas Family Residential Center in Dilley, Texas.

51. On January 8, 2016, Ms. Sanchez-Chicas and J-A-S-, through new *pro bono* counsel, filed an administrative appeal of the Immigration Judge's decisions ordering their removal to El Salvador with the Board of Immigration Appeals (BIA).

52. The same day, the BIA issued an order staying the Immigration Judge's removal orders against Ms. Sanchez Chicas and J-A-S- pending consideration of the appeal by the BIA.

53. On or about January 29, 2016, the DHS Defendants transferred Ms. Sanchez Chicas and J-A-S- to the Berks County Family Residential Center where they are currently detained.

54. On or about April 27, 2016, Ms. Sanchez Chicas and J-A-S- submitted to the BIA a motion to remand their case to the Immigration Judge based on ineffective assistance of their prior counsel.

55. Since Ms. Sanchez Chicas and J-A-S- have left El Salvador, M18 has also continued to persecute her family members. Her two brothers who remain in El Salvador have been tortured by M18. One was shot at by gang members in El Salvador, and is now in hiding. M18 has continued to search for Ms. Sanchez Chicas in El Salvador.

10

56. Ms. Sanchez Chicas and seven year old J-A-S- have been continuously detained in DHS Defendants' custody for over four and a half months, the past almost four months at the Berks County Family Residential Center.

57. Ms. Sanchez-Chicas' appeal remains pending before the BIA. The stay of removal is still in effect.

58. On April 22, 2016, DHS Defendants informed Ms. Sanchez Chicas that she and her daughter would continue to be detained.

### Plaintiffs Ms. Rivas Angel, J-E-R-, and J-A-R-: Fear of Persecution and Pending Immigration Proceedings

59. Before fleeing to the United States, Ms. Rivas Angel lived in El Salvador with her sons.

60. In October 2006, when Ms. Rivas Angel was 18 years old, she was attacked and raped in El Salvador.

61. In the wake of the rape, Ms. Rivas Angel became withdrawn, paralyzed, and numb. Her symptoms of depression became so debilitating that she sought psychological treatment.

62. In 2007, her son, J-A-R-, was born, a product of the rape.

63. In 2011, her son, J-E-R-, was born. Soon after, she and J-E-R-'s father separated, in large part due to Ms. Rivas Angel's continued trauma following the rape.

64. She raised her two children as a single mother.

11

65. Her rapist was and is a member of MS-13.

66. MS-13, also known as *Mara Salvatrucha*, is a powerful and violent organization in El Salvador that is engaged in a conflict with the legitimate Salvadoran state. MS-13 is often referred to as a transnational criminal organization or a "gang."

67. Her brother thereafter disappeared after he resisted MS-13's efforts to recruit him.

68. In late 2014, Ms. Rivas Angel's rapist called her multiple times and told her he wanted his son. She refused. He threatened her with death if she did not comply with his demands.

69. Fearing imminent harm—acutely aware of the dangers facing those who disobey MS-13 and of the Salvadoran police's inability to provide protection—Ms. Rivas Angel fled to the United States with J-E-R- and J-A-R-.

70. On or about September 20, 2014, the DHS Defendants took Ms. Rivas Angel, J-E-R- and J-A-R- into custody near the United States-Mexico border and held them at a border patrol detention facility.

71. On or about September 24, 2014, the DHS Defendants released Ms. Rivas Angel, J-E-R- and J-A-R- with instructions to appear for proceedings before an Immigration Judge, pursuant to 8 U.S.C. § 1229a(a), to determine whether they could lawfully remain in the United States or would be ordered removed.

72. Ms. Rivas Angel retained an attorney who represented her, J-E-R- and J-A-R- in removal proceedings before the Immigration Judge. She informed the attorney

12

of her rape and fear of returning to El Salvador.

73. The attorney erroneously advised Ms. Rivas Angel that she was not eligible for asylum, and that the best way to proceed with her case was to ask for a removal order from the Immigration Judge.

74. Ms. Rivas Angel did not understand the United States legal immigration system, did not speak English, and relied on the advice of her then-immigration attorney.

75. The attorney did not apply for asylum under 8 U.S.C. § 1158 nor any other relief from deportation on Ms. Rivas Angel's behalf, nor on behalf of J-E-R- and J-A-R-, despite their prima facie eligibility for asylum. Instead, the attorney requested that the Immigration Judge enter an order of removal against Ms. Rivas Angel, J-E-R- and J-A-R-.

76. The Immigration Judge entered a removal order against J-E-R- and J-A-R- in December 2014, and against Ms. Rivas Angel in January 2015.

77. The removal proceedings were conducted in English without Spanish interpretation for Ms. Rivas Angel, J-E-R- and J-A-R-.

78. The Immigration Judge did not advise Ms. Rivas Angel, J-E-R- or J-A-R-, in any language, of their rights in removal proceedings, including their right to apply for relief from removal, including asylum, and the right to appeal his decision.

79. Ms. Rivas Angel's attorney id not explain her right to contest removal and to appeal the Immigration Judge's decision.

13

80. Ms. Rivas Angel, J-E-R- and J-A-R-, were not detained during their proceedings before an Immigration Judge pursuant to 8 U.S.C. § 1229a(a). Ms. Rivas Angel, J-E-R- and J-A-R- appeared at all scheduled hearings before the Immigration Judge.

81. On November 17, 2015, the DHS Defendants took Ms. Rivas Angel into immigration custody in Georgia and detained her at the Irwin County Detention Center. J-E-R- and J-A-R- remained at their home in Georgia with family members.

82. On January 2, 2016, the DHS Defendants arrested J-E-R- and J-A-R- at their home and took them into immigration custody. The DHS Defendants escorted Ms. Rivas Angel to the home so she was present while her children were arrested. The DHS Defendants transferred Ms. Rivas Angel, J-E-R- and J-A-R-, to the South Texas Family Residential Center in Dilley, Texas.

83. On January 5, 2016, Ms. Rivas Angel, J-E-R- and J-A-R-, through new *pro bono* counsel, filed an administrative appeal of the Immigration Judge's decisions ordering their removal to El Salvador with the Board of Immigration Appeals (BIA).

84. The same day, the BIA issued an order staying the Immigration Judge's removal orders against Ms. Rivas Angel, J-E-R- and J-A-R-, pending consideration of the appeal by the BIA.

85. On or about March 8, 2016, the DHS Defendants transferred Ms. Rivas Angel, J-E-R- and J-A-R- to the Berks County Family Residential Center where they are currently detained.

86. On or about March 14, 2016, Ms. Rivas Angel, J-E-R- and J-A-R-, submitted

14

to the BIA a motion to remand their case to the Immigration Judge based on ineffective assistance of their prior counsel for failure to seek asylum on their behalf.

87. Ms. Rivas Angel has been continuously detained in DHS Defendants' custody for over six months. Four year old J-E-R- and eight year old J-A-R- have been continuously detained in DHS Defendants' custody for over four and a half months. All three have been detained at the Berks County Family Residential Center for over two months.

88. Ms. Rivas Angel's appeal remains pending before the BIA. The stay of removal is still in effect.

89. On April 21, 2016, DHS Defendants informed Ms. Rivas Angel that she and her sons would continue to be detained.

### The Berks County Residential Center

90. The Berks County Residential Center is located in Leesport, Pennsylvania. It is operated by the Berks County Commissioners under a contract with the DHS Defendants.

91. Ms. Sanchez Chicas is detained at the BCRC under the discretionary authority of the DHS Defendants.

92. J-A-S- is detained at the BCRC under the discretionary authority of the DHS Defendants.

93. Ms. Rivas Angel is detained at the BCRC under the discretionary authority of

15

the DHS Defendants.

94.  J-E-R- and J-A-R- are detained at the BCRC under the discretionary authority of the DHS Defendants.

95.  J-A-S- has not been adjudicated as delinquent under the laws of the State of Pennsylvania.

96.  Neither J-E-R- nor J-A-R- has been adjudicated as delinquent under the laws of the State of Pennsylvania.

97.  On or about November 13, 2012, the Berks County Commissioners applied for licensing of the BCRC as required under Pennsylvania law.

98.  On or about February 21, 2013, the State of Pennsylvania licensed the BCRC to provide "Residential Services – community based, dependent and delinquent" pursuant to state law. *See* 55 Pa. Code Chap. 3800: Child Residential and Day Treatment Facilities. Licensing was valid through February 21, 2014.

99.  On or about February 21, 2014, the State of Pennsylvania renewed the license of the BCRC through February 21, 2015 under the same provisions of state law with a modification to licensing made on November 22, 2013 authorizing the expansion of the bed capacity from 64 beds to 96 beds.

100.  On or about February 21, 2015, the State of Pennsylvania renewed the license of the BCRC through February 21, 2016 under the same provisions of state law.

101.  On or about March 9, 2015, the Berks County Commissioners requested a

16

modification to the license to increase the bed capacity from 96 to 192.

102.  On October 22, 2015, the State of Pennsylvania deferred adjudication of the licensing modification request. The State of Pennsylvania through its Department of Human Services explained that "Pennsylvania law makes no provision for [the State] to license family residential facilities." The State of Pennsylvania explained that "BCRC is no longer operating as the type of facility for which it was originally and continues to be licensed."

103.  On or about October 22, 2015, the State of Pennsylvania found that the BCRC operates as a secure facility.

104.  On January 27, 2016, the State of Pennsylvania found that the BCRC is not in compliance with the Pennsylvania state child welfare laws. The State of Pennsylvania revoked the certificate of compliance, denied the request to renew the certificate of compliance and denied the request for modification of the license.

105.  The BCRC is not in compliance with all applicable state child welfare laws of the State of Pennsylvania.

106.  The BCRC uses internal locks, guards and major restraining construction and employs procedures associated with correctional facilities.

107.  The BCRC is a secure facility.

108.  Plaintiffs are not at liberty to leave the BCRC.

109.  Defendants have not made and recorded prompt and continuous efforts toward reunifying J-A-S-, J-E-R-, and J-A-R- with their family and toward release.

17

110. The detention of families unnecessarily exposes families with high rates of previous trauma to additional psychological trauma, putting children like J-A-S-, J-E-R-, and J-A-R- and their mother at greater risk for physical and mental health problems.

111. Plaintiffs are depressed and suffer from the effects of trauma. They require specialized and appropriate mental health services. J-A-S-, J-E-R-, and J-A-R- are entitled to mental health services.

112. The BCRC does not provide adequate Spanish-speaking mental health services as required under the Flores Agreement and has not provided the required services to Plaintiffs.

113. The prolonged detention of Plaintiffs has aggravated their symptoms of trauma.

114. The BCRC has not provided Plaintiffs with dignified, safe, and sanitary facilities; appropriate mental health services, adequate medical and dental care services, appropriate individual and group counseling services, acculturation and adaption services, or a reasonable right of privacy.

## Claims for Relief

### Count I: Violation of the Flores Agreement – Placement Decision Under Paragraph 14

115. All previous paragraphs are incorporated as though fully set forth herein.

116. The detention of Plaintiffs is not required to secure their appearances before immigration authorities and the immigration court or for their safety.

18

117.   Therefore, the failure to release J-A-S-, J-E-R-, and J-A-R- to their mothers without unnecessary delay, and to simultaneously release their mothers, violates Paragraph 14 of the Flores Agreement.

118.   Pursuant to Paragraph 24B of the Flores Agreement, J-A-S-, J-E-R-, and J-A-R-, may seek judicial review in this Court to challenge Defendants' failure to release them.

### Count II: Violation of the Flores Agreement – Placement Decision Under Paragraph 18

119.   All previous paragraphs are incorporated as though fully set forth herein.

120.   Defendants have failed to make continuous efforts at family reunification and release under Paragraph 14 since taking J-A-S-, J-E-R-, and J-A-R- into custody, in violation of Paragraph 18 of the Flores Agreement.

121.   Pursuant to Paragraph 24B of the Flores Agreement, J-A-S-, J-E-R-, and J-A-R- may seek judicial review in this Court to challenge Defendants' failure to release them.

### Count III: Violation of the Flores Agreement – Paragraph 19 Violation

122.   All previous paragraphs are incorporated as though fully set forth herein.

123.   The BCRC is not a licensed program within the meaning of the Flores Agreement.

124.   Therefore, the decision to place Plaintiffs at the BCRC violates paragraph 19 of the Flores Agreement.

125.   Pursuant to Paragraph 24B of the Flores Agreement, J-A-S-, J-E-R-, and J-

19

A-R- may seek judicial review in this Court to challenge Defendants' decision to place them in an unlicensed facility.

### Count IV: Violation of the Flores Agreement –
### Paragraph 6 Violation

126. All previous paragraphs are incorporated as though fully set forth herein.

127. The BCRC is a secure facility and does not, inter alia, provide dignified, safe, and sanitary facilities; appropriate mental health services, adequate medical and dental care services, appropriate individual and group counseling services, acculturation and adaption services, or a reasonable right of privacy.

128. Therefore, the decision to place Plaintiffs at the BCRC violates Paragraph 6 of the Flores Agreement.

129. Pursuant to Paragraph 24B of the Flores Agreement, J-A-S-, J-E-R-, and J-A-R- may seek judicial review in this Court because the facility in which they have been placed does not comply with the standards set forth in Exhibit 1 of the Flores Agreement.

### Request for Relief

**WHEREFORE**, Plaintiffs request that the Court grant the following relief:

A.    Declare that the BCRC is not a licensed program under Paragraph 6 of the Flores Agreement;

B.    Declare that the BCRC is not in compliance with all applicable state child welfare laws under Paragraph 6 of the Flores Agreement and with the conditions set forth in Exhibit 1 of the Flores Agreement;

C.    Order Defendants to release the minor Plaintiffs to their parents, with their

20

parents' simultaneous release, under Paragraph 14 of the Flores Agreement;

D.    Award Plaintiffs reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

E.    Award all other relief to Plaintiffs that the Court deems just, equitable, and proper.

Respectfully submitted this 23rd day of May, 2016.

/s/ Bridget Cambria
**BRIDGET CAMBRIA***
CAMBRIA & KLINE, PC
123 North 3rd Street
Reading, PA 19601
(484) 926-2014 (tel)
(484) 926-2032 (fax)
bridget.cambria@cambriaklinelaw.com
*Counsel of Record

/s/ Stephen W Manning
**STEPHEN W MANNING****
IMMIGRANT LAW GROUP PC
333 SW Fifth Avenue Suite 525
Portland, OR 97204
503.241.0035 (tel)
503.241.7733 (fax)
smanning@ilgrp.com

/s/ Marc Van Der Hout
**MARC VAN DER HOUT****
**AMALIA WILLE****
VAN DER HOUT, BRIGAGLIANO & NIGHTINGALE LLP
180 Sutter Street, Suite 500
San Francisco, CA 94104
415.981.3000 (tel)
415.981.3003 (fax)
ndca@vblaw.com

** seeking admission *pro hac vice* in the Eastern District of Pennsylvania